**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **BOBBIE LYNN GRIMES,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:16-CV-3280-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Consent** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

By consent of the parties and the order transferring case dated March 16, 2017 (doc. 17), this

case has been transferred for the conduct of all further proceedings and the entry of judgment.

Before the Court are *Appellant's Brief*, filed August 27, 2017 (doc. 28) and *Defendant's Response*

*Brief*, filed September 26, 2017 (doc. 29). Based on the relevant filings, evidence, and applicable

law, the Commissioner's decision is **AFFIRMED**.

## I.  BACKGROUND[1]

Bobbie Lynn Grimes[2] (Plaintiff) seeks judicial review of a final decision by the Acting

Commissioner of Social Security (Commissioner)[3] denying her claim for disability insurance

benefits (DIB) under Title II of the Social Security Act.[4] (R. at 7-10.)

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

[2]  Plaintiff's brief identifies her as "Bobby" Lynn Grimes, but all other pleadings and the administrative record identify her as "Bobbie" Lynn Grimes. (*See* doc. 28 at 1.)

[3]  At the time of filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

[4]  Plaintiff was previously denied DIB benefits under a separate application submitted on May 16, 2006. (R. at 18.) She failed to timely appeal that denial and does not attempt to appeal it here. *See Anderson v. Sullivan*, 887 F.2d 630, 632 n.1 (5th Cir. 1989) (explaining that when a claimant fails to timely appeal the denial of a disability claim, the claim becomes final).

## A.    <u>Procedural History</u>

On January 28, 2013, Plaintiff filed her application for DIB, alleging disability beginning May 23, 2008.  (R. at 165-66.)  Her claim was denied initially and upon reconsideration.  (R. at 82-93, 95-107.)  She requested a hearing before an administrative law judge (ALJ) and personally appeared and testified on December 18, 2014.  (R. at 61-81.)  On March 20, 2015, the ALJ issued a decision finding that she was not disabled and denying her claim for benefits.  (R. at 15-32.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on April 13, 2015. (R. at 11-14.)  The Appeals Council denied her request for review on July 1, 2016, making the ALJ's decision the final decision of the Commissioner.  (R. at 7-10.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

## B.    <u>Factual History</u>

### 1.    **Age, Education, and Work Experience**

Plaintiff was born on December 22, 1961, and was 52 years old at the time of the hearing. (R. at 27, 165.)  She had a ninth grade education, could speak English fluently, and had past relevant work experience as a home health aide, customer complaint clerk, credit reporting clerk, and cashier. (R. at 27, 75-76.)

### 2.    **Medical Evidence**

On September 5, 2007, Plaintiff met with Dr. A.A. Rasheed, M.D., for a "sharp pain" in her chest. (R. at 241-42.) The pain was "localized to the left seventh and eighth ribs" and appeared to be "mostly mechanical" when she strained and stretched her chest. (R. at 241.) The pain was triggered after Plaintiff "did some housework" on the previous day. (R. at 241.) Dr. Rasheed noted that the review of her systems had been "completely unremarkable excepting for chronic neck pain,

low back pain, [and] numbness and tingling." (R. at 241.) During the physical examination, he noted that Plaintiff weighed 210 pounds, had blood pressure at 150/90, no lymphadenopathy, normal heart sounds, clear lungs, and "[t]ender over the left costochondral junctions, seventh and eight rib." (R. at 241.) His impressions were costochondritis, chronic neck pain, carpal tunnel, and chronic low back pain with neuropathy. (R. at 242.) Plaintiff was prescribed Lyrica for pain and instructed to return for a follow-up. (R. at 242.)

On June 18, 2010, Plaintiff met with Dr. Rasheed because the chest pain had returned. (R. at 243.) During the physical examination, she weighed 222 pounds, her blood pressure was elevated at 183/98, but her mood was "good." (R. at 243.) His diagnostic impression was hypertension, and he prescribed Lisinopril to help lower her blood pressure. (R. at 243.)

On May 12, 2011, Plaintiff presented to the Greenville Community Health Center (GCHC) with lower back pain. (R. at 263.) The physical examination showed no abnormal findings except for "morbid obesity." (R. at 263, 303.) She reported feelings of depression "due to her working" while her "husband [was] unemployed," but her neurological examination was normal. (R. at 263.) The medical impressions were chronic back pain, "adjustment problems," morbid obesity, and depression. (R. at 263.) Plaintiff was directed to diet, exercise, complete physical therapy, and take her blood pressure medicine as prescribed. (R. at 263.)

On June 24, 2011, Plaintiff had an MRI of her thoracic spine at GCHC. (R. at 282.) It showed that "disc heights are maintained at all thoracic levels" with "no obvious foraminal narrowing" and "no definite spinal stenosis." (R. at 282.) There was "minimal bulge and spurring" at the T8/9 and T9/10 vertebrae. (R. at 282.) The impression was "endplate and disc degenerative change posteriorly at T8/9 and T9/10" but no spinal canal or foraminal stenosis. (R. at 282.)

Between June 17, 2011, and January 6, 2012, Plaintiff returned to GCHC every two months for follow-up evaluations and prescription medication management. (R. at 259-62.) There were no abnormal findings during any of the physical examinations, except for elevated blood pressure that ranged from 136/74 to 144/80. (R. at 259-62.) She continued to report pain from "head to toe" and "thought she was disabled." (R. at 261.) She was prescribed Lyrica for pain during her appointment on June 17, 2011, but she was later told to "stop Lyrica" and instead take over-the-counter Ibuprofen on October 18, 2011. (R. at 262, 259-60.) During her appointment on January 6, 2012, she was referred for an additional MRI. (R. at 259.)

On February 17, 2012, Plaintiff met with Dr. Richard Ozmun, M.D., and received an MRI of her lumbar spine. (R. at 280-81.) The exam showed "no obvious transverse curvature," disc desiccation at the L4/5 and L5/S1 vertebrae,"moderate disc narrowing" at L5/S1, and a "4 mm nodular enhancement within the cauda equina at the level of L3 vertebral body." (R. at 280.) Dr. Ozmun's impression was "multilevel disc disease most notable at L5/S1" and the 4 mm nodule at the L3 vertebra "reflect[ed] a lipoma of the filum terminale." (R. at 280.) He recommended a neurosurgical evaluation. (R. at 280.)

From July 10, 2012, to February 25, 2013, Plaintiff returned to GCHC every three months for follow-up evaluations and refills of her prescription medications. (R. at 244-54.) Her blood pressure levels decreased and her hypertension was noted as "currently stable," but she continued to be prescribed Lisinopril. (R. at 244-45, 251-52, 254-55.) Plaintiff complained of "chronic pain" at each appointment, but her physical exam showed that she was in "no acute distress," and there was only "mild tenderness [in her] left lumbar paraspinal muscles." (R. at 246, 252, 255-56.) Her psychiatric assessments showed that she was "oriented to time, place, person, and situation," with

"normal insights, normal judgment," and the "appropriate mood and affect." (R. at 246, 253, 256.) At her appointment on July 10, 2012, she was instructed to begin Paxil in addition to her blood pressure and pain medication. (R. at 246.) She was further instructed on spinal exercises to help alleviate the pain and increase her range of motion. (R. at 253.)

On July 10, 2013, Dr. Robin Rosenstock, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment of Plaintiff based upon the medical evidence on record. (R. at 88-89.) Dr. Rosenstock opined that she had the following exertional limitations: could occasionally lift/carry 20 pounds; could frequently lift/carry 10 pounds; could stand/walk for a total of about 6 hours in an 8-hour workday; could sit for a total of about 6 hours in an 8-hour workday; and had an unlimited ability to push/pull. (R. at 88.) Dr. Rosenstock also opined that she had the following postural limitations: frequently able to climb ramps/stairs; never able to climb ladders/ropes/scaffolds; occasionally able to balance, kneel, and crawl; and frequently able to stoop and crouch. (R. at 89.) She identified no manipulative, visual, communicative, or environmental limitations. (R. at 89.)

On May 2, 2013, Dr. Matthew Wong, Ph.D., a SAMC, completed a mental RFC assessment of Plaintiff based upon the medical evidence submitted. (R. at 89-91.) He opined that Plaintiff was moderately limited in the areas of understanding, remembering, and carrying out detailed instructions, as well as in the ability to maintain attention and concentration for extended periods. (R. at 90.) She could understand, remember, and carry out detailed but not complex instructions; make decisions on her own; attend and concentrate for extended periods; interact with others; and respond appropriately to changes in a routine work setting. (R. at 91.)

On September 5 and October 10, 2013, Plaintiff received treatment at GCHC. (R. at 287-92.)

During her appointment on September 5, 2013, her physical exam showed no abnormalities or tenderness, but "several skin tags" were present and removed later on the same day. (R. at 291-92.) During her appointment on October 10, 2013, she was diagnosed with hyperlipidemia and showed symptoms of a depressive disorder. (R. at 287-89.) Her psychiatric examination showed that she was "oriented to time, place, person, and situation," with "normal insights, normal judgment," and the "appropriate mood and affect." (R. at 289.)

On October 30, 2013, Dr. Jeanine Kwun, M.D., a SAMC, completed a reconsideration case assessment form concerning Plaintiff's medically determinable physical impairments. (R. at 101-03.) She affirmed Dr. Rosenstock's physical RFC assessment and agreed with the limitations found, after reviewing all of the evidence in the record. (R. at 103.)

Also on October 30, 2013, Dr. Murray Lerner, Ph.D., a SAMC, completed a reconsideration case assessment form concerning Plaintiff's mental capabilities. (R. at 103-05.) He affirmed Dr. Wong's assessment that Plaintiff was not significantly limited in any mental ability, and was moderately limited in the ability to maintain attention and concentration for extended periods and to understand, remember, and carry out detailed instructions. (R. at 103-04.) He also concurred with Dr. Wong that Plaintiff could understand, remember, and carry out detailed but not complex instructions; make decisions on her own; attend and concentrate for extended periods; interact with others; and respond appropriately to changes in a routine work setting. (R. at 104.)

### 3.    Hearing Testimony[5]

On December 18, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 61-81.)  Plaintiff was represented by an attorney.  (R. at 63.)

---

[5]  The administrative record also contains the transcript from the hearing for Plaintiff's previous claim for DIB, filed on May 16, 2006, that was denied. (R. at 33-60.) Because she does not seek review of that denial, it is not recited here.

### a. Plaintiff's Testimony

Plaintiff testified that she was 52 years old and had left high school after completing the ninth grade. (R. at 66.) She had not obtained a GED or any other vocational training. (R. at 66.) Her last job had been in 2008 as a home healthcare aide where she cleaned the patient's home and "just . . . [took] care of him." (R. at 67.) Prior to that, she had worked as a cashier at Target where she "bagg[ed] groceries" and provided "customer service." (R. at 67-68.) She had to lift "about 10, 15 pounds" at this job regularly. (R. at 68.) She also had worked at Choice Point as a customer service representative, where she was primarily in charge of "data entry." (R. at 68.)

When asked about her physical impairments and limitations, Plaintiff identified pain in her hands, neck, lower back, legs, and knees. (R. at 69.) She had "numbness" in her legs and feet that caused pain when she walked. (R. at 69.) She could be on her feet for "[p]robably, an hour" during an 8-hour workday. (R. at 70.) She also had "numbness" in her hands that caused "problems" manipulating small items like buttons or coins, but she had never received surgery, treatment, or a formal diagnosis for carpal tunnel. (R. at 70-71, 74.) She testified that "[f]ive pounds would probably be too much" for her to lift frequently. (R. at 71.) During a typical day, she tried to "do some housework" if it was a "good day," but she had to "do it at [her] own pace" and "usually [had] to take a day or two to get over it" if she had experienced pain. (R. at 71-72.) She had taken Advil, Tramadol, and Gabapentin for her pain. (R. at 73.) She also had been prescribed Paxil for her depression since July 2012. (R. at 73-74.)

### b. VE's Testimony

The VE testified that she had reviewed the vocational information in Plaintiff's file and determined that she had the following past relevant work experience: home health aide, DOT

354.377-014 (SVP: 3, medium); customer complaint clerk, DOT 241.367-014 (SVP: 5, sedentary); credit reporting clerk, DOT 203.362-014 (SVP: 4, sedentary); and cashier, DOT 211.462-010 (SVP: 2, light). (R. at 75-76.)

The ALJ asked the VE to consider a hypothetical individual of the same age, education, and work history as Plaintiff, and who also had the following restrictions: lift and carry 20 pounds occasionally and 10 pounds frequently; sit for up to 6 hours in an 8-hour workday; stand and walk for a combined 6 hours in an 8-hour workday; not climb ladders, ropes, or scaffolds; occasionally balance, kneel, crawl, crouch, stoop, and climb ramps/stairs; frequently handle and finger; understand, remember, and carry out detailed but not complex instructions; and only have occasional contact with supervisors, coworkers, and the public. (R. at 76-77.) This hypothetical individual must also avoid exposure to hazards, extreme cold, and concentrated exposure to vibrations. (R. at 77.)

The VE testified that the hypothetical individual would not be able to perform any of Plaintiff's past relevant work, but this individual could perform jobs that existed in the national and regional economy, which included the following: photocopying machine operator, DOT 204.685-014 (SVP: 2, light), with 66,000 jobs nationally and 2,000 in Texas; retail marker, DOT 209.587-034 (SVP: 2, light) with 20,000 jobs nationally and 1,000 in Texas; mail clerk, DOT 209.687-026 (SVP: 2, light) with 100,000 jobs nationally and 2,000 in Texas; and cleaner, DOT 323.687-014 (SVP: 2, light) with 224,000 jobs nationally and 14,000 in Texas. (R. at 77-78.)

The ALJ asked if the hypothetical individual would be able to perform those same jobs if she was limited to only occasional handling and fingering instead of frequent. (R. at 78.) The VE responded that the individual would not be able to perform those jobs and the "resulting occupations do not exist in significant numbers in the national economy." (R. at 78.) The ALJ then asked if this

was also true for sedentary jobs, to which the VE responded that "[a]t the sedentary level, such an individual would be precluded from substantial, gainful work activity, given the limitations in manual and finger dexterity, bilaterally." (R. at 78-79.)

Plaintiff's attorney asked the VE if Plaintiff had any transferable skills to a sedentary occupational base. (R. at 79.) The VE testified that her customer service clerk work and her merchandising work would be transferable to sedentary jobs. (R. at 79-80.)

## C.    The ALJ's Findings

The ALJ issued a decision denying benefits on March 20, 2015. (R. at 15-32.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of May 23, 2008, through her date last insured of March 31, 2013.  (R. at 22.)  At step two, the ALJ found that she had the following severe impairments: degenerative disc disease of the lumbar and thoracic spine, morbid obesity, polyarthralgias, diabetes mellitus with mild neuropathy, and a mood disorder.  (R. at 22.)  Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations.  (R. at 21.)

Next, the ALJ determined that Plaintiff retained the RFC to perform the full range of light work with the following limitations: lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit for 6 hours out of an 8-hour workday; stand/walk on a combined basis for 6 hours in an 8-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; never climb ropes, ladders, or scaffolds; frequently handle and finger; limited to understanding, remembering, and carrying out non-complex instructions and tasks; avoid more than occasional contact with coworkers, supervisors, and the public; avoid exposure to hazards such as unprotected

heights, dangerous machinery, sharp objects, and open flames; and avoid extreme cold and close proximity to concentrated vibrations. (R. at 24-27.)

At step four, the ALJ determined that Plaintiff was unable to perform any of her past relevant work. (R. at 27.) At step five, the ALJ relied upon the VE's testimony to find her capable of performing work that existed in significant numbers in the national economy, including jobs such as photocopy machine operator, retail marker, mail clerk, and cleaner. (R. at 28.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from the alleged onset date of May 23, 2008, through March 31, 2013. (R. at 29.)

## II. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.* at 436.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding

of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents three issues for review:

A.  The ALJ erred in determining [Plaintiff's] residual functional capacity (RFC), and such finding is not supported by substantial evidence of record.

B.  The ALJ erred in failing to properly account for [Plaintiff's] moderate deficiencies in concentration, persistence, or pace in his RFC finding or in his hypothetical question to the VE.

C.  The ALJ failed to obtain an explanation as to a possible conflict between the

VE's testimony and the *Dictionary of Occupational Titles* (DOT).

(doc. 28 at 1.)

## A.     RFC Determination

Plaintiff first argues that the ALJ erred in determining her RFC because his "conclusion that [she] could perform the physical demands of a reduced range [of] light work is contradicted by his own findings and is not supported by substantial evidence of record." (doc. 28 at 6-7.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1. The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ's determination necessarily includes an assessment of the nature and extent of a claimant's limitations and determines what the claimant can do "on a regular and continuing basis." *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) ("Both [20 C.F.R. § 404.1545 and SSR 96–8p] make clear that RFC is a measure of the claimant's capacity to perform work 'on a regular and continuing basis.'"). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC

decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision, or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994)

A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* They may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence". *See Johnson*, 864 F.2d at 343 (citations omitted).

In his decision, the ALJ specifically reviewed the medical records from Dr. Rasheed, the SAMCs, and GCHC, as well as the MRI results and determined that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar and thoracic spine, morbid obesity, polyarthralgias, diabetes mellitus with mild neuropathy, and a mood disorder. (R. at 20-22.) He further determined that the "combination of the degenerative changes to the back and [Plaintiff's] obesity affect her ability to lift, carry, stand, and walk." (R. at 25.) The ALJ then detailed her allegations about her impairments, including her testimony that she could be on her feet for only 1 hour at a time and was unable to lift 5 pounds "on a repetitive basis." (R. at 25.) The ALJ found that her "medically determinable impairments could reasonably be expected to cause some symptoms,"

but her statements "concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (R. at 25.) The ALJ noted that she stated in her function report that she could "prepare a simple breakfast and lunch," "feed and water the dog," and "prepare a lot of frozen dinners and sandwiches for her family," and that she could perform "light household chores and laundry at a slow pace," could drive, and could shop for groceries weekly. (R. at 25-26.) He also noted how she "did not have an inordinate amount of treatment between the alleged onset" and the date of last insured; that "the medical records do not document limitations with the use of her hands or feet in excess of what has been found [in the RFC];" and that "no doctor [had] reported that she is disabled or more limited than found [in the RFC]." (R. at 26.) He ultimately agreed with the SAMCs on Plaintiff's physical limitations, i.e., that she was limited to a "reduced (but substantial) range of light work." (R. at 26-27.) He, however, found that additional evidence "justifie[d] a conclusion that [Plaintiff was] more severely limited by her mood disorder or affective disorder than was previously determined" by the SAMCs. (R. at 26-27.)

Plaintiff contends that the ALJ's findings on her morbid obesity and back pain "contradict" his RFC determination that she could walk for 6 hours in an 8-hour workday. (doc. 28 at 7-8.) She argues that "[g]iven the ALJ's acknowledgment that [Plaintiff's] obesity would affect her ability to walk, and the objective medical evidence demonstrating conditions that would have an effect upon [Plaintiff's] ability to walk, substantial evidence of record does not support the conclusion that [Plaintiff] could perform the unimpaired standing/walking requirements of light work." (*Id*. at 8.) While the ALJ did acknowledge in his decision that her impairments "affect[ed] her ability to lift, carry, stand, and walk," he went into detail in his decision on exactly how those impairments affected her RFC. (R. at 23-26.) Contrary to Plaintiff's assertion that the ALJ found her ability to

walk/stand to be "unimpaired," the ALJ actually included in his decision several postural limitations that further limited her mobility, including that she could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs. (R. at 24.) These findings are supported by the medical evidence that showed a normal range of motion, muscle strength, and stability in all extremities without pain, including Dr. Rasheed's and GCHC's medical records and the assessments from the SAMCs. (R. at 88-89, 241, 246, 252, 259-63, 303.) The decision does not show that the ALJ "contradicted" himself; it shows that he fulfilled his role as the finder of fact to weigh the evidence in the record, resolve all conflicts in the evidence, and make an administrative assessment of Plaintiff's ability to work. *See Dise v. Colvin,* 630 F. App'x 322, 326 (5th Cir. 2015) (holding that a "diagnosis is not, itself, a functional limitation"); *see Zimmerman v. Astrue*, 288 F. App'x 931, 934 (5th Cir. 2008) (holding that a similar RFC for light work with hazard precautions accounted for a claimant's obesity); *see also Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (explaining that "[t]he mere presence of some impairment is not disabling per se.").

Plaintiff further contends that the ALJ "failed to recognize all of [the] limitations that [Plaintiff] reported she had in her ability to perform daily activities," including personal care and household chores. (doc. 28 at 7-10.) The ALJ's decision, however, explicitly considered all of her self-reported limitations before finding that they were "not fully credible" because they were inconsistent with the medical evidence, her own function report, and her lack of medical history.[6] (R. at 25-26.) He considered how Plaintiff reported that she could "prepare a simple breakfast and

---

[6] Plaintiff points out that her lack of medical treatment was due to her being uninsured and not being able to pay for additional medical care. (doc. 28 at 10.) An inability to afford treatment must be corroborated by the objective record, however, and she does not point to any part of the record that corroborates her claim that she could not obtain medical treatment from other sources, such as free or low-cost health clinics. *See Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) (condition disabling in law if a "claimant cannot afford prescribed treatment or medicine, and can find no way to obtain it").

lunch," "feed and water the dog," continue to drive, "prepare a lot of frozen dinners and sandwiches for her family," perform "light household chores and laundry at a slow pace," and could shop for groceries weekly. (R. at 25-26.) Plaintiff does not point to any medical evidence that was consistent with the severe impairments that she identified, and she only asserts that "[e]ven if [Plaintiff] were able to perform these activities unencumbered, they are not . . . indicative of the ability to perform a wide range of light work." (doc. 28 at 9.)  Substantial evidence, particularly the medical records from GCHC, support the ALJ's findings on Plaintiff's physical limitations in the RFC, and the ALJ did not err by rejecting Plaintiff's reported limitations. *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985) (holding that the ability to drive, attend church, do light yard work, grocery shop, and care for personal needs helped support light RFC). As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole.  *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting *Newton*, 209 F.3d at 458).  Accordingly, a reviewing court must defer to the ALJ's decisions.  *See Leggett*, 67 F.3d at 564. To the extent that Plaintiff complains of the failure to include more restrictive physical limitations in the RFC, the ALJ did not err, and remand is not required on this issue.

**B.**   **Mental Limitations**

Plaintiff next argues that the ALJ erred when he limited Plaintiff's mental limitations to "non-complex instructions and tasks" in both her RFC function-by-function assessment and the hypothetical to the VE because it "does not properly account" for his Step 2 findings. (doc. 28 at 11.)

During the RFC evaluation, an ALJ must conduct a function-by-function assessment based on exertional and nonexertional capacity. *See* SSR 96-8p, 1996 WL 374184. As with exertional

capacity, nonexertional capacity is expressed in work-related functions. *Id.* Work-related mental functions and activities include the abilities of: (1) understanding, remembering, and carrying out instructions; (2) using judgment in work decisions; (3) responding appropriately to supervision and peers, and (4) dealing with changes in a routine setting. *Id.* The function-by-function assessment, however, does not require an exhaustive discussion of each work-related mental activity as long as it is considered in the ALJ's analysis. *See Haynes v. Colvin*, No. 6:12-CV-00330-WSS, 2015 WL 3964783, at *5 (W.D. Tex. June 29, 2015) (citing *Walton v. Astrue*, No. 3:10-CV-815-D, 2011 WL 195975, at 9-10 (N.D. Tex. Jan. 20, 2011)). "[E]ven if the ALJ fails to conduct a function-by-function analysis, he satisfies this requirement if he bases his RFC assessment, at least in part, on a state medical examiner's report containing a function-by-function analysis." *Jones v. Astrue*, No. 3:11-CV-3416-M-BH, 2013 WL 1293900, at * 16 (N.D. Tex. Mar. 7, 2013) (citing *Beck v. Barnhart*, 205 F. App'x 207, 213-14 (5th Cir. 2006)).

In his decision, the ALJ found at Step 2 that Plaintiff had a severe "mood disorder" that resulted in mild restrictions in activities of daily living and moderate difficulties in social functioning and concentration, persistence, or pace. (R. at 23.) After reviewing her testimony and the medical evidence, the ALJ found that additional evidence "justifie[d] a conclusion that [Plaintiff was] more severely limited by her mood disorder or affective disorder than was previously determined" by the SAMCs. (R. at 26-27.) He then conducted a function-by-function assessment of the mental limitations in Plaintiff's RFC, and ultimately determined she was limited to understanding, remembering, and carrying out non-complex instructions and tasks; must avoid more than occasional contact with coworkers, supervisors, and the public; must avoid exposure to hazards such as unprotected heights, dangerous machinery, sharp objects, and open flames; and must avoid

extreme cold and close proximity to concentrated vibrations. (R. at 24-27.) During the hearing, the ALJ asked the VE to consider a hypothetical individual of the same age, education, and work history as Plaintiff who could perform a reduced range of light work and had the same mental limitations as found in the RFC. (R. at 76-77.) The VE responded that the hypothetical individual would be capable of performing jobs such as photocopying machine operator, retail marker, mail clerk, and cleaner. (R. at 77-78.)

Plaintiff contends that the ALJ erred because his RFC finding and hypothetical do not "reasonably incorporate" his Step 2 finding that she had moderate deficiencies in concentration, persistence, or pace. (doc. 28 at 14.) She cites cases from the Seventh Circuit Court of Appeals holding that limiting an RFC and hypothetical to "simple, repetitive work does not necessarily address deficiencies of concentration, persistence or pace." (*Id*. (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2010))). The Fifth Circuit Court of Appeals has not formally adopted this reasoning, however, and only requires the RFC used in the hypothetical to "incorporate reasonably" the claimant's impairments. *See Hardman v. Colvin*, 820 F.3d 142, 149 (5th Cir. 2016) (internal citations omitted). It has previously found similar RFC assessments to adequately account for moderate limitations in concentration, persistence, or pace. *See Herrara v. Comm'r of Social Sec.*, 406 F. App'x 899, 905 (5th Cir. 2010) (RFC for unskilled work); *see Bordelon v. Astrue*, 281 F. App'x 418, 423 (5th Cir. 2008) (RFC for rare public interaction, low stress, and simple one- or two-step instructions); *see also Holmes v. Astrue*, No. 3:11-CV-2634-G-BH, 2013 WL 638830, at *16 (N.D. Tex. Jan. 25, 2013) (finding that the ALJ's determination that the claimant was moderately limited in maintaining concentration, persistence, and pace was not inconsistent with his ability to carry out detailed, but not complex instructions), *adopted by* 2013 WL 646510 (N.D. Tex.

Feb. 20, 2013). Even if the Fifth Circuit had adopted *O'Connor-Spinner*, the ALJ's RFC finding and hypothetical in this case are distinguishable because he included more restrictions than simply "non-complex tasks." He also restricted Plaintiff to only occasional contact with supervisors, coworkers, and the public, and also to avoid exposure to hazards, extreme cold, and concentrated exposure to vibrations. *See Capman v. Colvin*, 617 F. App'x 575, 579 (7th Cir. 2015) (finding that an RFC for simple, routine tasks that did not require working with the public or in close proximity to others adequately accounted for moderate limitations in concentration, persistence, or pace); *see also Sweeten v. Astrue*, No. 3:11-CV-934-G-BH, 2012 WL 3731081, at *12 (N.D. Tex. Aug. 13, 2012), *adopted by* 2012 WL 3735884 (N.D. Tex. Aug. 29, 2012) (finding that "[b]ecause of the reference to pain and other significant limitations . . ., the ALJ's hypothetical contained the requisite alternative phrasing discussed in [*O'Connor-Spinner v. Astrue*]").

The record shows that the ALJ considered and incorporated Plaintiff's moderate limitations in maintaining concentration, persistence, or pace into the RFC assessment and the hypothetical. Substantial evidence in the record supports the ALJ's finding that Plaintiff was limited to understanding, remembering, and carrying out non-complex instructions and tasks; avoiding more than occasional contact with coworkers, supervisors, and the public; avoiding exposure to hazards; and avoiding extreme cold and close proximity to concentrated vibrations. *See Taylor v. Colvin*, No. 4:13-CV-534, 2014 WL 4443434, at *6 n.10 (N.D. Tex. Sept. 9, 2014) (collecting cases) (finding that "the ALJ's mental RFC determination limiting [the plaintiff] to the performance of detailed, but not complex, instructions is not contradictory with the ALJ's finding [that the plaintiff] was mildly limited in his activities of daily living and social functioning, and moderately limited in his ability to maintain concentration, persistence, or pace"); *see also Smith v. Colvin*, No. 3:13-CV-1884-N,

2014 WL 1407437, at *5 (N.D. Tex. Mar. 24, 2014) (finding that the "ALJ was not required to expressly include a limitation for concentration, persistence, or pace in her hypothetical to the VE" when the "ALJ considered the limitations in concentration, persistence, or pace when determining Plaintiff's RFC"). Remand is not required on this issue.

**C.**    <u>**Step 5**</u>

Plaintiff next argues that the ALJ's Step 5 findings are not supported by substantial evidence because he "failed to obtain an explanation as to a possible conflict between the VE's testimony and the Dictionary of Occupational Titles (DOT)." (doc. 28 at 14.)

To be considered disabled, a claimant must have a severe impairment that makes her unable to perform her previous work or any other substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a). According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with [her] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy. 20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

The Commissioner may consult several different sources of evidence, including vocational

experts and the DOT,[7] to determine when presumptively-disabled claimants can perform alternative and available work. *See Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 608 (E.D. Tex. 2009). Vocational experts assess whether jobs exist for a person with the claimant's precise abilities and help to determine complex issues, such as whether a claimant's work skills can be used in other work, and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). The ALJ may further rely on the testimony of a VE in response to a hypothetical question[8] or other similar evidence. *Newton*, 209 F.3d at 458; *Bowling*, 36 F.3d at 435. Social Security Ruling 00–4p requires that prior to relying upon evidence from a VE to support a determination of disability, the ALJ must identify and obtain a reasonable explanation for any apparent conflicts between occupational evidence provided by a VE and information in the DOT. *See* SSR 00-4p, 2000 WL 1898704, at *1-2 (Dec. 4, 2000). As part of her duty to fully develop the record, the ALJ has an "affirmative responsibility" to inquire of the VE on the record whether or not there is such an inconsistency. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016) (citations omitted).

During the hearing, the ALJ asked the VE to consider a hypothetical individual of the same age, education, and work history as Plaintiff, and who also had the following restrictions: lift and

---

[7]   The DOT and its supplement, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), comprise a comprehensive listing of job titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs. The Commissioner recognizes the DOT/SCO publications as authoritative, and routinely relies on them "for information about the requirements of work in the national economy." SSR 00–4p, 2000 WL 1898704, at *2.

[8]   "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

carry 20 pounds occasionally and 10 pounds frequently; sit for up to 6 hours in an 8-hour workday; stand and walk for a combined 6 hours in an 8-hour workday; not climb ladders, ropes, or scaffolds; occasionally balance, kneel, crawl, crouch, stoop, and climb ramps/stairs; frequently handle and finger; understand, remember, and carry out detailed but not complex instructions; have only occasional contact with supervisors, coworkers, and the public; and avoid exposure to hazards, extreme cold, and concentrated exposure to vibrations. (R. at 76-77.) The VE responded that the hypothetical individual would be capable of performing the jobs of photocopying machine operator, retail marker, mail clerk, and cleaner. (R. at 77-78.) The ALJ then asked the VE during the hearing if there was "any conflict between [her] testimony and the information contained in the Dictionary of Occupational Titles," to which the VE responded "No, your honor." (R. at 79.) The ALJ determined that Plaintiff had an RFC for a limited range of light work and, relying exclusively on the testimony from the VE, found at Step 5 that Plaintiff was "capable of making a successful adjustment to other work that existed in significant numbers in the national economy," including jobs such as photocopy machine operator, retail marker, mail clerk, and cleaner. (R. at 28.) He additionally found that "[p]ursuant to SSR 00-04p, the undersigned has determined that the [VE's] testimony is consistent with the information contained in the DOT." (R. at 28.)

Plaintiff contends that the ALJ violated SSR 00-4p because he "made no inquiry into the possible conflict between the VE's testimony and the DOT as to the availability of jobs for persons limited to occasional contact with supervisors, co-workers, and the general public." (doc. 28 at 15.) She argues that the "possible conflict" is due to the "pervasive use of training periods or probationary periods in today's workplace," but simultaneously points out that "[n]either the DOT, nor its companion publication, Selected Characteristics of Occupations Defined in the Revised

Dictionary of Occupational Titles (SCO), explain the training requirements of certain jobs." (*Id.*) She instead points to the Occupational Outlook Handbook (OOH) that identifies how a mail clerk's "[t]raining . . . may last less than a month" and a photocopy machine operator and cleaner typically "undergo short-term on-the-job training."[9] (*Id.* at 15.) SSR 00-4p, however, only requires the ALJ to resolve apparent conflicts between the VE testimony and the DOT, and it does not additionally require resolution of a "possible conflict" with the OOH. *See* SSR 00-4p, 2000 WL 1898704, *2; *see Graves*, 837 F.3d at 593 (noting that there is no violation of SSR 00-4p if the plaintiff fails to show the VE's "testimony was actually inconsistent with the DOT"). The ALJ expressly sought evidence at the hearing that the VE's testimony was consistent with the DOT, and Plaintiff has failed to show an apparent conflict between the two. She accordingly fails to show that the ALJ did not comply with SSR 00–4p.

Even assuming the existence of a conflict between the DOT and the VE's testimony, it would not be direct or obvious and would instead be an implied or indirect conflict. *See Zapata v. Colvin*, No. 4:13-CV-340-Y, 2014 WL 4354243, at *11 (N.D. Tex. Sept. 2, 2014) (noting the difference between direct and implied conflicts with a VE's testimony). Plaintiff did not identify any conflict at the administrative hearing, and "[t]he Fifth Circuit has held that claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present the conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Id.* (citing *Carey*, 230 F.3d at 142). Remand is not warranted on this issue.

---

[9] The Occupational Outlook Handbook is "a publication from the Department of Labor's Bureau of Labor Statistics," and it is available online at https://www.bls.gov/ooh/. *Huizar v. Astrue*, 642 F. Supp. 2d 614, 640 (W.D. Tex. 2009).

## IV. CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** this 8th day of March, 2018.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE